**STATE of Missouri ex rel. OFFICE OF the PUBLIC COUNSEL, Appellant/Cross–Respondent,**

v.

**PUBLIC SERVICE COMMISSION of the State of Missouri, Respondent.**

**State of Missouri ex rel. Southern Union Company d/b/a Missouri Gas Energy, Respondent/Cross–Appellant,**

v.

**Public Service Commission of the State of Missouri, Respondent.**

Nos. SD 31221, SD 31253.

Missouri Court of Appeals, Southern District, Division Two.

March 20, 2012.

Marc Poston, Jefferson City, MO, for Appellant/Cross Respondent.

Diana C. Carter, Jefferson City, MO, for Respondent/Cross Appellant.

Jennifer Heintz, Jefferson City, MO, for Respondent, PSC.

WILLIAM W. FRANCIS, JR., Presiding Judge.

The Office of the Public Counsel ("OPC") and Southern Union Company ("Southern Union") separately appeal from the circuit court's order affirming two orders of the Public Service Commission ("PSC"). The orders were: (1) a substantive order issued February 10, 2010, and (2) a tariffs order issued February 24, 2010. The substantive order resolved issues relevant to natural gas tariffs proposed by Missouri Gas Energy ("MGE"), which is an operating division of Southern Union. The substantive order also rejected the tariffs proposed by MGE, and ordered MGE to file tariffs that comport with the substantive order. The tariffs order approved the tariffs subsequently filed by MGE.

At the request of the parties, the appeals were consolidated.

OPC asserts the PSC erred in adopting the "Straight Fixed–Variable" ("SFV") rate design requested by MGE for its "Residential Service" rate class and newly defined "Small General Service" rate class.

OPC divides its complaint into two points. OPC's first point claims the PSC erred because the substantive order is "unreasonable" in that two findings of fact—(1) a "traditional" rate design [1] subsidizes "low-usage" customers, and (2) "an average low-income ... consumer uses above[-]average amounts of natural gas,"—are not supported by competent and substantial evidence, are against the weight of the evidence, and are arbitrary, capricious, and an abuse of the PSC's discretion. OPC's second point claims the PSC erred because the substantive order is "unlawful" in that it subjects customers within each rate class who "use lower[-]than[-] average amounts of natural gas to undue and unreasonable prejudice and disadvantage[,]" in violation of sections 393.130, RSMo Cum.Supp.2002 and 393.140.[2]

Southern Union asserts a single point of error, and contends the PSC erred in setting MGE's authorized rate of return: (1) by using Southern Union's capital structure, rather than a hypothetical capital structure that is similar to the capital structures of stand-alone, local natural gas distribution companies that operate businesses comparable to the business operated by MGE as a division of Southern Union; and, alternatively, (2) in failing to increase MGE's return on equity to reflect the additional financial risk posed by Southern Union's "equity-thin capital structure," so that these errors make the substantive order "unlawful" and "unreasonable."

Finding no merit in the points of OPC or Southern Union, we affirm the PSC's substantive order and tariffs order.

### Facts and Procedural History

Southern Union is a publicly-traded corporation, and is a diversified natural gas company engaged primarily in the transportation, storage, gathering, processing, and distribution of natural gas in multiple regions of the United States. Southern Union's distribution operations primarily involve distributing natural gas to persons who consume the gas; i.e., end-users of the gas, in Missouri and Massachusetts. Southern Union receives slightly less than 14% of its operating income from, and devotes slightly more than 14% of its assets to, distribution of natural gas to end-users.

MGE is an operating division of Southern Union and has no legal existence or capital structure separate from Southern Union. MGE distributes natural gas to approximately 500,000 end-users in parts of thirty counties in western Missouri, including the communities of St. Joseph, Kansas City, Warrensburg, and Joplin. In 2008, MGE's customers included approximately 438,000 residential customers, and approximately 58,000 customers that would fall within the Small General Service rate class.

Prior to April 3, 2007, MGE recovered its distribution costs [3] allocated to a rate class by charging its customers in that class a fixed+volumetric rate design each month. The rate design was intended to recover 55% of MGE's distribution costs through the fixed-customer charge, and 45% of MGE's distribution costs through the volumetric rate. Effective April 3,

---

1. A fixed charge plus a volumetric rate, based on the amount of natural gas the customer used, is a "fixed+volumetric" or "traditional" rate design.

2. All references to statutes are to RSMo.2000, unless otherwise specified.

3. Also known as either "margin," "cost of service," "non-gas costs," or "non-commodity costs," and sometimes referred to as "fixed costs."

2007, the PSC approved a change in MGE's rate design for its Residential Service rate class to the SFV rate design that recovered all of MGE's distribution costs allocated to that class through a single, fixed monthly charge.[4]

Under both rate designs, each customer also pays a separate volumetric charge[5] for the natural gas used by that customer that is authorized under MGE's purchased-gas-adjustment clause. The cost-of-gas charge includes only the wholesale cost of the gas plus interstate transportation and storage costs, and constitutes "approximately 70% of a typical residential customer's overall bill." MGE derives no profit from the cost-of-gas charge, and that charge is not at issue in this rate case.

On April 2, 2009, MGE submitted proposed tariffs—rate schedules—to the PSC that were intended to implement a general rate increase for natural gas service that would increase MGE's annual revenue slightly more than 32 million dollars. The proposed tariffs continued MGE's SFV rate design for MGE's Residential Service rate class and extended that rate design to MGE's Small General Service rate class. MGE proposed to continue its fixed + volumetric rate design for its Large General Gas Service and Large Volume Service rate classes. The proposed tariffs were to be effective May 2, 2009, but the PSC suspended the effective date until February 28, 2010.

The PSC set the test year as the 2008 calendar year with an update period ending April 30, 2009, and ordered that specified components of MGE's "revenue requirement . . . be trued-up as of September 30, 2009."

Following public hearings in Joplin on August 31, 2009, Warrensburg on September 1, 2009, St. Joseph on September 8, 2009, and Kansas City and Lee's Summit on September 9, 2009, the PSC held evidentiary hearings on October 26 through November 2, 2009, a true-up hearing on December 8, 2009, and a final hearing on December 23, 2009. All disputed issues, other than issues relating to rate design, cost of capital, and energy efficiency, were resolved by stipulation.

### Evidence Before the PSC

Extensive evidence was presented at the hearings. MGE's rate-of-return expert Frank J. Hanley ("Hanley") recommended that a hypothetical capital structure, based on comparable local natural gas distribution companies, be used to determine MGE's authorized rate of return.

Hanley initially recommended a return on equity for MGE equal to 11.25%, but subsequently lowered his recommendation to a return on equity equal to 10.5%. In the absence of the SFV rate design, Hanley recommended a return on equity equal to 10.75%. Hanley recommended a short-term debt cost equal to 5.492%, and a long-term debt cost equal to 6.08%.

Panhandle Eastern Pipeline Company ("Panhandle") is a wholly-owned subsidiary of Southern Union. In an alternative position on capital structure before the PSC, Hanley initially proposed that Panhandle's debt be included in Southern Union's capital structure for the purpose of calculating the cost of Southern Union's long-term debt, before reversing course and recommending that Panhandle's debt be excluded from Southern Union's capital structure.

---

4. *See State ex rel. Missouri Office of Public Counsel v. Public Service Commission of Missouri, 293 S.W.3d 63, 70 n. 5, 71 n. 6 (Mo. App. S.D.2009).*

5. Also known as a "Cost of Gas," "Purchased Gas Adjustment," or "commodity" charge.

The Staff of the PSC's[6] rate-of-return expert, David Murray ("Murray"), recommended that a hypothetical capital structure, based on comparable local natural gas distribution companies, be used to determine MGE's authorized rate of return. Murray recommended a return on equity equal to 9.5%.

Southern Union's consolidated capital structure includes the debt of its wholly-owned subsidiary, Panhandle. Evidence indicated that at least in 2008, Southern Union used proceeds from higher-cost debt issued by Panhandle to repay lower-cost debt issued by Southern Union. In the event the PSC used Southern Union's capital structure to determine MGE's authorized rate of return, Murray recommended that the PSC should not follow its prior practice of excluding Panhandle's debt from the calculation of Southern Union's cost of debt, but instead should include Panhandle's debt because the "financing activities" of Southern Union and Panhandle were "becoming more blurred with time."

OPC's rate-of-return expert, Daniel J. Lawton ("Lawton"), recommended that the PSC use Southern Union's capital structure to determine MGE's authorized rate of return, and specifically opined that Southern Union's capital structure should include Panhandle's debt. Lawton's calculations of Southern Union's cost of capital clearly showed he also included Panhandle's debt in his calculation of Southern Union's cost of long-term debt. Lawton recommended a return on equity equal to 10%.

Use of the hypothetical capital structure proposed by MGE to determine MGE's rate of return "would allow MGE to earn an equity return on some capital that was financed" with lower-cost debt, with the result being MGE would recover revenue in excess of its cost of capital. Regulatory bodies "have used hypothetical capital structures to deal with" equity-thin capitalization, but typically only when the utility is a subsidiary and not when the utility is a division.

Lawton believed the use of the SFV rate design would merit a reduction in MGE's cost of capital because that rate design "guarantee[d] [MGE's] revenue stream." The reduction could be accomplished through a .5% reduction in MGE's return on equity, or an increase in MGE's long-term debt and a corresponding decrease in MGE's equity. The reduction also could be accomplished through a decrease in MGE's revenue requirement or cost of service.

The SFV rate design is not common, but is "starting to sweep the country" "among regulatory authorities" as a "proposed rate design."

The experts' recommendations for MGE's authorized rate of return ranged from Murray's 7.34%, to Lawton's 7.772%, to Hanley's 8.137%.

Southern Union's bond rating is investment grade.

MGE's rate design expert, Russell A. Feingold ("Feingold"), testified a separate "[volumetric or] demand charge" is not appropriate in a rate design for a Residential Service rate class "based on the degree of homogeneity that typically exists within a residential class." This is also true of MGE's Small General Service rate class. In these circumstances, a volumetric or demand charge "will cause rates to diverge from costs, create undue discrimination

**6.** The Staff of the PSC ("Staff") is not a party to this appeal, but presented evidence and argument before the PSC.

within the rate class, and provide an inappropriate price signal to customers." The SFV rate design "track[s] costs," and "avoids undue discrimination [and eliminates intra-class subsidies] by charging each customer [within a rate class] the average cost incurred to serve that customer."

The quantity of gas required to be distributed is not a factor in MGE's selection of the size of a distribution main. Fixed distribution costs do not change with changes in customers' gas use. More specifically, Feingold testified:

[I]t is well recognized that delivery service costs are fixed in nature .... [and,] they are the same for all [Residential Service] customers served by [MGE] based on the minimum size of main installed. Second, a gas utility builds its system to provide safe and reliable service to customers on the expected coldest day for the system. Once the delivery facilities are in place to satisfy the system reliability considerations, changes in the amount of gas delivered to a customer have no impact on the cost of delivery service. Very simply, if a customer uses one cubic foot of gas or 13.2 Mcf per day (the design day capacity per customer for a two inch main on [MGE's] gas system), there is no difference in the cost of delivery service, on average, within the [Residential Service] or [Small General Service] rate classes. Given the size of the customers [within the Residential Service and Small General Service rate classes], the minimum size of main installed by [MGE] will serve the customers at the system average density and operating pressure.

A portion of MGE's delivery service cost is allocated between customer rate classes based on class demand, i.e., design day requirements, in order to "shar[e] the benefits of the common costs of the system in such a way that each class benefits from the scale economies created by serving all classes of customers through a common or joint use distribution system." However, the portion of MGE's delivery service costs allocated to the Residential Service and to the Small General Service rate classes, based on that class's demand, is not again allocated within the class based on an individual customer's demand because all customers within the class "have similar peak load characteristics, coincidence factors, and load factors," and the cost to serve each customer within the class is not dependent on the amount of gas the customer uses because "the minimum size of main will serve virtually all [MGE's] [Residential Service] and [Small General Service] customers." The cost to serve an individual customer within a class may "vary by the date of installation, by the type and location of the main, and by the length of the service line[,]" but "it is not practical to determine cost for each customer based on" these non-volume variations with the result that these non-volume variations are averaged across the entire class.

Dr. Feingold also stated that "virtually all of MGE's margin consists of fixed costs." "Fixed costs do not vary with volume once the cost is incurred."

Staff's rate design expert, Anne E. Ross ("Ross"), concluded in Staff's "Class Cost-of–Service and Rate Design" report as follows. The difference in the cost of serving two Residential Service rate class customers "is not driven by the size of the customer's load." Although MGE's Residential Service rate class may have a "few" customers who use large amounts of natural gas, it "muddies the water to point to those few" when designing fair rates for the majority of MGE's residential customers. The majority of MGE's residential customers fall within "a relatively small band of usage," and Ross "has not seen

any evidence that a difference of a few hundred Ccf per year creates a difference in the costs incurred to serve two customers." Any difference in the cost to serve two of MGE's residential customers "is more likely driven by factors other than [the amount of natural gas the customer uses], such as distance from the transmission pipeline, customer density in the area, [terrain] . . . or [the age and cost] of the equipment serving the customer." Generally, residential customers are not charged "different amounts to reflect these" non-amount-of-gas-use factors.

"The smallest diameter service line and meter is sufficient to serve the load generated" by any one of MGE's residential customers. A residential customer that uses only a small amount of natural gas underpays MGE's cost of service for that customer if MGE's cost of service is recovered in part through a volumetric rate, and a residential customer who uses more than the average amount of natural gas overpays that customer's cost of service under a fixed + volumetric rate design.

As with MGE's Residential Service customers, MGE's Small General Service customers have "small" loads and "the difference between two customers' loads [are] even smaller. *If there is* any real difference in the cost to serve any two customers, it is likely driven by factors other than" gas volume for which different rates generally are not charged. (Underscore in original).

Ross also testified that the "vast majority of a utility's non-gas costs are fixed costs." Allocation of costs based on demand is appropriate between, but not within, rate classes. In calendar year 2008, MGE's Residential Service customers paid "nearly $2,205,000 less" under MGE's existing SFV rate design than those customers would have paid under OPC's requested fixed + volumetric rate design because

the weather was "slightly colder than normal" that year. The volumetric portion of OPC's requested rate design would have caused MGE's Residential Service customers to overpay MGE's cost of service for those customers for that year.

OPC's rate design expert, Barbara A. Meisenheimer ("Meisenheimer"), recommended MGE be ordered to return to a "55 percent . . . fixed rate and 45 percent . . . volumetric [55% fixed + 45% volumetric] rate design." She related that under the SFV rate design, MGE would not have an incentive to sell "more gas" to existing customers subject to that rate design. Under a fixed + volumetric rate design, MGE would have an incentive to sell "more gas" to existing customers subject to that rate design, and the volumetric portion of the rate design would give the customer an incentive to use less gas. Customers who use more than an average amount of natural gas will pay less on an annual basis under the SFV rate design than under a fixed + volumetric rate design, and customers who use less than an average amount of natural gas will pay more on an annual basis under the SFV rate design than under a fixed + volumetric rate design. A fixed + volumetric rate design for a customer class does not result in high-use customers within the class subsidizing low-use customers within the class because the fixed charge is large enough to cover all "direct" costs of service that are not allocated between customer classes based on demand.

Meisenheimer stated it "would be an enormously complex process" to determine the actual cost to distribute natural gas to a specific customer, that cost would vary from customer to customer, and rate design does not attempt to "capture those cost differences." OPC has not developed "a cost of service for residential customers that quantifies the difference in annual

cost to serve individual customers [at] various annual usage levels." She also stated that under the SFV rate design, MGE may fail to earn its authorized revenue requirement if it experiences a net loss of customers, and may fail to earn its authorized rate of return on investment if it operates inefficiently.

Meisenheimer believed that, on average, high-income households use more natural gas than an average customer, and low-income households use less natural gas than an average customer. Meisenheimer based her opinions about natural gas usage by low-income customers on aggregate studies of the nation, and of the region that includes Missouri, Kansas, and the five states directly north of those two states. Those studies may not have included information from customers in MGE's service territory, but Meisenheimer believes the studies are representative for MGE customers. Generally, the number of heating degree days for a particular location increases the further north the place is located.

Meisenheimer also believed that the SFV rate design "encourages seasonal disconnects," but did not know a specific number or percentage of customers that disconnect on a seasonal basis. Meisenheimer further believed that the PSC should encourage energy efficiency.

MGE expert, Philip B. Thompson ("Thompson"), conducted a study of all MGE customers by zip code, based on information from October 1998 thorough September 2000. The study showed a "U-shaped" relationship between mean household income within a zip code and the mean amount of natural gas used by households within that zip code, with income shown on the horizontal axis and amount of gas used shown on the vertical axis. This relationship indicates low-income and high-income residential customers served by MGE generally use above-average amounts of natural gas while middle-income customers generally use below-average amounts of natural gas. Each category of customer would have individual customers that were atypical.

Thompson stated that approximately 82% of MGE's customers who receive "low income energy assistance" "would experience higher winter bills" under OPC's requested fixed + volumetric rate design than under MGE's current SFV rate design.

MGE's Director of Customer and Government Relations, Pam Levetzow ("Levetzow"), testified that MGE's customers who receive help from the "Low Income Heating Energy Assistance Program [LIHEAP]" "are generally ... low[-]income customers, [and][ ] also tend to be higher[-]than[-]average users," and the SFV rate design "is very beneficial" to them.

MGE's Director of Pricing and Regulatory Affairs, Michael R. Noack ("Noack"), testified that "rate design is a lot more art than science."

At the true-up hearing, Noack testified that Southern Union's capital structure remained the same and, in the event the PSC declined to use a hypothetical capital structure, requested that the PSC use Southern Union's capital structure as of September 30, 2009. He stated that in 2008, MGE's residential customers had an annual usage of approximately 824 Ccf of natural gas for the year, but the majority (80%) of its residential customers used between 400 and 1300 Ccf of natural gas for the year. Less than 3% of MGE's residential customers used more than 1,900 Ccf of natural gas in 2008. Residential customers that used less than 824 Ccf of natural gas, "would pay a little more" on an annual basis under the SFV rate design than under a fixed + volumetric rate design. Approximately 43% of MGE's residential cus-

tomers used less than 824 Ccf of natural gas in 2008.

MGE's Chief Operating Officer, Robert J. Hack ("Hack"), testified that reduction in business risk attributable to the SFV rate design is offset by elimination of potential increased revenue from colder-than-normal weather.

Evidence introduced by Staff showed the national average return on equity for gas utilities authorized in the first three quarters of 2009 was 10.11%.

### Positions Taken Before the PSC

In arguments before the PSC, Staff, MGE, and OPC took the following positions. On the issue of rate design, Staff recommended the PSC approve MGE's proposed SFV rate design for its Residential Service and Small General Service rate classes, and OPC recommended the PSC reject MGE's proposed rate design and approve a "[55% fixed + 45% volumetric] rate design" for those classes.[7] On the issue of what capital structure should be used in calculating MGE's authorized rate of return, MGE and Staff recommended the PSC use a hypothetical capital structure similar to the capital structures of stand-alone local natural gas distribution companies with operations comparable to MGE's operations. OPC recommended that the PSC use Southern Union's actual consolidated capital structure, including Panhandle's debt, both in calculating MGE's debt-to-equity ratio and in calculating MGE's cost of long-term debt.[8] In the

event the PSC decided to use Southern Union's actual capital structure to determine MGE's rate of return, MGE argued that: (1) its return on equity should be increased to reflect the additional financial risk posed by Southern Union's "equity-thin capital structure," and (2) Staff join OPC in recommending that Panhandle's debt be included in Southern Union's capital structure both in calculating MGE's debt-to-equity ratio and in calculating MGE's cost of long-term debt.

### The PSC's Findings and Conclusions

In its order issued February 10, 2010, the PSC found as follows. Ratemaking involves: (1) determining the revenue required to permit the utility to pay the prudent costs of providing the utility service and receive a reasonable return on the utility's investment in plant and equipment dedicated to public service, i.e., original cost less accumulated depreciation; and (2) then designing a rate that will collect the required revenue from the utility's customers, i.e., ratepayers. A reasonable rate of return for any utility is the utility's composite cost of capital, which is the sum of the weighted cost of each component of the utility's capital structure, i.e., debt and owner equity. Historical cost for each capital component is used when possible except for the cost of common equity, where an estimate of that cost is used.

It is less expensive for a utility to borrow money than issue equity with the result that a capital structure with a large

---

7. In the alternative, OPC recommended a fixed+volumetric rate design with a "lost margin revenue recovery mechanism" ("LMRRM") for reductions in revenue caused by MGE administered energy efficiency programs for the Residential Service and Small General Service rate classes. The purpose of the LMRRM would be to make MGE indifferent to customers' initiation of energy efficiency measures pursuant to those programs.

8. In the event the PSC, contrary to OPC's recommendation, approved a SFV rate design for MGE's Residential Service and Small General Service rate classes, OPC recommended a reduction in MGE's cost of capital because the SFV rate design "guarantee[s] [MGE's] revenue stream."

percentage of debt will tend to produce a smaller composite cost of capital, but that tendency is balanced against the tendency of a capital structure with a large percentage of debt to increase the financial risk to equity owners with the result the equity owners will demand a higher return on their equity, which tends to produce a higher composite cost of capital. The lower the utility's composite cost of capital is, the lower the utility's reasonable rate of return, required revenue, and customer rates will be.

MGE is an operating division of Southern Union and has no separate existence. Investors who want to invest in MGE must invest in Southern Union. Southern Union's capital structure is a result of its management's decisions, including the decision to use a high percentage of lower-cost debt. Southern Union is investment grade. Use of a hypothetical capital structure with a larger-than-actual percentage of equity as requested by MGE, and recommended by Staff, would allow MGE to earn a higher equity return on capital actually financed by lower-cost debt, with the result that MGE would recover significant revenue in excess of its composite cost of capital. PSC found OPC expert Lawton to be the most credible on the issue of what capital structure should be used to determine MGE's rate of return.

After discussing in detail the PSC's determination in MGE's last two rate cases that Southern Union's management decision to utilize an "equity-thin capital structure" require Southern Union—and ultimately MGE—to accept the results of those decisions, including the use of Southern Union's actual capital structure in determining MGE's rate of return, the PSC concluded that it should again use Southern Union's actual capital structure in determining MGE's rate of return.

The PSC further found that determining an appropriate return on common equity is the most difficult part of determining a rate of return because the determination requires "speculation about the desires and requirements of investors," and the PSC "must turn to" experts for guidance and "often make difficult choices" between conflicting opinions. No "correct" rate of return on common equity exists, but the PSC can determine an "appropriate" rate of return on common equity. Staff's expert recommended a range of returns on common equity from 9.25 to 9.75% with a midpoint of 9.5%; OPC's expert recommended a range of returns on common equity from 9.5 to 10.5% with a midpoint of 10.0%; and MGE's expert recommended a return on common equity of 10.5%.

After carefully reviewing the qualifications and testimony of the rate-of-return experts for MGE, Staff and OPC, and noting the strengths and weaknesses of each expert's methodology, the PSC concluded Lawton was the "most persuasive" on the issue of the appropriate rate of return on common equity. The PSC also found that the United States Supreme Court's decisions in *Bluefield Water Works & Improv. Co. v. Pub. Serv. Comm'n of West Virginia,* 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923) and *Fed. Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), require MGE's return on common equity to be commensurate with returns on investments in other enterprises with corresponding risks. Further, that the "recent national average" return on common equity for gas utilities is 10.11% and the "zone of reasonableness" for MGE's return on common equity was from 9.11 to 11.11%. Based on these findings, the PSC concluded that MGE's appropriate return on common equity is 10%. The PSC declined to reduce MGE's return on equity by .5% for the SFV rate design authorized by the

PSC for MGE's Residential Service and Small General Service rate classes as recommended by Lawton because: (1) the decreased risk associated with the SFV rate design already was accounted for in Lawton's initial calculation because a majority of the companies in Lawton's proxy group had a significant portion of their revenues wholly or partially decoupled from the volume of natural gas they distributed; and (2) 10% would still be within Lawton's range of recommended, reasonable returns even after the range was reduced as Lawton suggested.

On rate design for MGE's Residential Service and Small General Service rate classes, the PSC found as follows. The PSC authorized MGE's requested SFV rate design for MGE's Residential Service and Small General Service rate classes. Also, the PSC found:

78. SFV rates are intended to recover fixed costs through fixed charges and variable costs (i.e., the cost of the gas commodity) through variable charges. Accordingly, SFV rates properly reflect the nature of the costs incurred by MGE to serve its [Residential Service] and [Small General Service] customers. Very simply, if a customer uses one cubic foot of gas or 13.2 Mcf per day (the design day capacity per customer for a two inch main on [MGE's] gas system), there is *no* difference in the cost of delivery service, on average, within the Residential [Service] or [Small General Service] rate classes. (Underscore in original).

Further, "[a] major goal in establishing reasonably homogenous classes is to limit both inter[-] and intra-class subsidies." "The cost to provide distribution service to customers within these homogeneous [Residential Service and Small General Service rate] classes does not vary based on the size of the customer's load." "To the con-

trary, the minimum installed size of distribution main will serve over 99% of [MGE's] residential customers ... [,]" and "will serve 99% of the customers served under [MGE's] new [Small General Service] rate class." "MGE's costs to serve any two [r]esidential customers are driven by factors *other* than customer size...." (Underscore in original). "Similarly, [MGE's] cost[-]of[-]gas delivery service is the same for customers in the [Small General Service rate] class." "MGE installs the same size meter, regulator service line, and distribution main to serve virtually all [Small General Service] customers regardless of the monthly or annual volume of gas they use[,]" with the result that "the size of the delivery service facilities is independent of gas volume...."

The SFV rate design "stabilizes both customers' bills and [r]esidential class revenue ... [,]" and prevents customers from overpaying MGE's cost of service during colder-than-normal weather as occurs with a fixed + volumetric rate design. "[R]oughly 57% of MGE's residential ratepayers should have bills" that are as low or lower than they would have been under a fixed + volumetric rate design. "[D]ifferent customers will fare better under different designs" and "it is not cost effective or practical to determine cost of service for every individual customer." The SFV rate design does not provide a utility with "certainty of revenue." The utility is still subject to revenue shortfalls attributable to a decline in "customer numbers" or an increase in "bad debts," and must operate prudently to achieve its authorized "earnings." However, the SFV rate design does "provide [MGE] with a more predictable and reliable revenue stream[,]" and "allows [MGE] to better position itself to cover its costs of operation and to earn its authorized rate of return."

The variable commodity charge in the SFV rate design comprises over 70% of a typical residential customer's bill, and gives customers a mechanism for directly lowering the largest portion of their bill by lowering their natural gas usage.

The SFV rate design is "simple" and "easy" to explain to customers, and "[t]he fixed monthly delivery charge component informs the customer of the fixed costs associated with connecting them to the distribution network to receive natural gas service."

Meisenheimer's "reliance on nationally and regionally aggregated data is less persuasive" than Thompson's reliance on his study of MGE's own service territory. "Nothing indicates that low-income customers as a group use a lower[-]than[-]average quantity of natural gas[,]" and Thompson's study of MGE's service territory indicates "[t]he income-consumption relationship for MGE's customers is 'U'-shaped[ ]" with above-average natural gas use by low- and high-income customers.

The PSC concluded:

106. A volumetric charge would likely have a regressive impact on low[-]income customers because low[-]income customers in MGE's service territory consume higher[-]than[-]average volumes.

107. Such a volumetric charge would not reflect the true costs of serving that class, and would also recreate intra-class subsidies that existed within the residential class.

. . . .

With SFV, high-use consumers will stop paying a disproportionate share of MGE's operating expenses.

The PSC supported these conclusions based on the fact that approximately 82% of MGE's customers who received "low[-]income energy assistance" "would experience higher winter bills" under OPC's requested fixed + volumetric rate design than under MGE's current SFV rate design, and were "in line with the theory that [fixed + volumetric] rate design harms those *unable* as opposed to *unwilling*, to make their residences more energy efficient, such as the elderly, disabled, and those unable to afford their own homes." (Underscore in original).

The Energy Independence and Security Act of 2007 directs regulatory authorities to align utility incentives with the deployment of cost-effective, energy-efficiency programs, and to consider: (1) separating fixed-cost recovery from the volume of transportation or sales service provided; and (2) providing utilities incentives for the "success[ful] management of energy efficiency [programs]," and adopting rate designs that encourage energy efficiency.[9] MGE's requested SFV rate design removes MGE's disincentive to encourage natural gas conservation.

The PSC's substantive order and subsequent tariffs order increased MGE's annual revenue slightly more than 16 million dollars.

The primary issues for our determination are:

1. Whether two findings of fact relating to intra-class subsidization under a fixed + volumetric rate design, and the amount of natural gas used by "an average low-income . . . consumer" are unreasonable.

2. Whether the SFV rate design is unlawful because it subjects customers "who use lower[-]than[-]average amounts of natural gas to undue and unreasonable prejudice."

9. 15 U.S.C. § 3203(b)(6)(A) and (B)(i), (ii) and (iv) (2009) (effective December 20, 2007).

3. Whether the use of Southern Union's capital structure to determine MGE's authorized rate of return is "unlawful" or "unreasonable," or, alternatively, whether MGE's authorized return on equity should have been increased to reflect the additional financial risk posed by Southern Union's "equity-thin capital structure."

**Standard of Review**

Our Supreme Court recently described our standard of review as follows:

This Court reviews the decision of the PSC rather than that of the circuit court. Under section 386.510, the appellate standard of review of a PSC order is two-pronged: first, the reviewing court must determine whether the PSC's order is lawful; and second, the court must determine whether the order is reasonable. The burden of proof is upon the appellant to show that the order or decision of the PSC is unlawful or unreasonable. The lawfulness of an order is determined by whether statutory authority for its issuance exists, and all legal issues are reviewed de novo. The decision of the [PSC] is reasonable where the order is supported by substantial, competent evidence on the whole record; the decision is not arbitrary or capricious or where the [PSC] has not abused its discretion.

*State ex rel. Praxair, Inc. v. Missouri Public Service Commission,* 344 S.W.3d 178, 184 (Mo. banc 2011) (internal citations and quotations omitted). In addition:

If substantial evidence supports either of two conflicting factual conclusions, we are bound by the findings of the administrative tribunal. The determination of witness credibility is solely within the discretion of the [PSC], which is free to believe none, part, or all of a witness's

testimony. Essentially, this Court will not re-weigh the evidence to reach its own conclusion. It is only where a[PSC] order is clearly contrary to the overwhelming weight of the evidence that we may set it aside. Finally, where a decision rests on the exercise of regulatory discretion, we will not substitute our judgment for that of the [PSC], particularly on issues within its area of expertise.

*State ex rel. Missouri Office of Public Counsel v. Public Service Commission of Missouri,* 293 S.W.3d 63, 69 (Mo.App. S.D. 2009) (internal citations and quotations omitted). And, "[t]he [PSC] is also afforded the benefit of reasonable inferences that may be drawn from the facts." *State ex rel. Noranda Aluminum, Inc. v. Public Service Commission of Missouri,* 356 S.W.3d 293, 297 (Mo.App. S.D.2011).

**Analysis**

**I. OPC FAILS TO PERSUADE U.S. THE PSC'S FINDINGS ON INTRA–CLASS SUBSIDIZATION AND ABOVE–AVERAGE USE OF NATURAL GAS BY MGE'S LOW–INCOME CUSTOMERS ARE UNREASONABLE.**

**A. Intra-class Subsidization.**

█ We address OPC's first point by breaking it into two arguments. OPC first claims the PSC erred because the substantive order is "unreasonable" in that the PSC's finding of fact that a fixed+volumetric rate design subsidizes "low-usage" customers is not supported by competent and substantial evidence, is against the weight of the evidence, and is arbitrary, capricious, and an abuse of the PSC's discretion. The testimony of Feingold and Ross that the cost of service for any customer within the Residential Service and Small General Service rate classes does

not depend on the volume of natural gas used by that customer, is competent and substantial evidence that supports the PSC's finding, and establishes the finding is not arbitrary, capricious, an abuse of discretion, or clearly contrary to the overwhelming weight of the evidence.

OPC's core complaint with this finding is its strong belief, as well as the belief of expert Meisenheimer, that a significant portion of MGE's cost of service for customers within MGE's Residential Service and Small General Service rate classes varies with the amount of natural gas a customer within that class uses and that this portion, therefore, should be recovered through a volumetric charge. Under OPC's theory, high-use customers within the class cost more to serve than low-use customers within the class, and a fixed + volumetric rate design accurately allocates the cost of service attributable to a particular customer, to that customer. Because a fixed + volumetric rate design accurately allocates MGE's cost of service to each customer within the class, no customer subsidizes any other customer within the class.

On the other hand, MGE, Staff, Feingold, and Ross believe just as firmly that "virtually all" and the "vast majority" of MGE's margin or non-gas costs for customers, within the classes at issue, is fixed and does not depend on the volume of natural gas used by a particular customer within the class. Under the theory of MGE and Staff that recovering any significant portion of MGE's cost of service for the class through a volumetric charge results in customers who use less than an average amount of natural gas underpaying MGE's cost to serve them, and customers who use more than an average amount of natural gas overpaying MGE's cost to serve them, with the result that a fixed + volumetric rate design causes higher-than-average users within a class to subsidize lower-than-average users within that class.

As its findings show, the PSC chose to resolve this conflict in factual conclusions by accepting the conclusions of Feingold and Ross. The opinions of Feingold and Ross are competent and substantial evidence, are not clearly contrary to the overwhelming weight of the evidence, and the PSC's acceptance of those opinions was not arbitrary, capricious, or an abuse of discretion. As a result, we are bound by the PSC's finding that a fixed + volumetric rate design subsidizes MGE's "low-usage" Residential Service and Small General Service rate class customers. OPC fails to persuade us that this finding is unreasonable, and its first argument under this point is denied.[10]

10. OPC argues that the [PSC]'s findings of cost causation and subsidization within the Residential Service and Small General Service rate classes are not supported by competent and substantial evidence because the findings are not supported by an "intra-class cost of service study," and refers us to the Western District's decision in *State ex rel. Public Counsel ("Atmos") v. Missouri Public Service Commission*, 289 S.W.3d 240 (Mo. App. W.D.2009). We do not understand the law or the Western District's decision in *Atmos* requiring a specific kind or form of evidence to be presented in order for the evidence to be competent and substantial, and we believe that the testimony of a well-qualified expert who has taken into account the important relevant facts in reaching an opinion on the topic in question constitutes competent and substantial evidence. *See Noranda*, 356 S.W.3d at 308–10. In *Atmos*, the Western District did say:

No intra-class study was conducted to determine the cost to serve high volume versus low volume residential users or to establish that one group of residential users was subsidizing another. In the absence of such a study, neither [experts'] testimony constitutes competent and substantial evidence upon which the Commission could conclude that high[-]volume customers are

## B. Above–Average Use of Natural Gas by MGE's Low–Income Customers.

In the second part of its argument on this issue, OPC claims the PSC erred because the substantive order is "unreasonable" in that the PSC's finding of fact that "an average low-income . . . consumer uses above-average amounts of natural gas" is not supported by competent and substantial evidence, is against the weight of the evidence, and is arbitrary, capricious, and an abuse of the PSC's discretion. Thompson's testimony that a study of MGE's customers indicates that MGE's low- and high-income customers in general both use above-average amounts of natural gas is competent and substantial evidence that supports the PSC's finding, and establishes the finding is not arbitrary, capricious, an abuse of discretion, or clearly contrary to the overwhelming weight of the evidence.

As with OPC's first argument, its argument here involves conflicting factual conclusions by experts. OPC and Meisenheimer firmly believe that in general, low-income customers use below-average amounts of natural gas based on studies that use regionally and nationally aggregated data. Just as firmly, MGE and Thompson believe that regardless of what may be true of natural gas consumers in other regions of the United States, MGE's low-income customers in general use above-average amounts of natural gas, based on Thompson's study of MGE's customers. Thompson's factual conclusion is supported by the fact MGE's customers who receive low-income heating energy assistance "tend to be higher[-]than[-]average users" of natural gas.

The PSC specifically found that the studies based on regionally and nationally aggregated data were "less persuasive" than Thompson's study of MGE's actual customers, and chose to resolve the conflict in factual conclusions by accepting Thompson's conclusion. Thompson's opinion is competent and substantial evidence, is not clearly contrary to the overwhelming weight of the evidence, and the PSC's acceptance of his opinion was not arbitrary, capricious, or an abuse of discretion. As a result, we are bound by the PSC's finding that "an average low-income . . . consumer uses above[-]average amounts of natural gas."

currently subsidizing low[-]volume customers.

*Atmos*, 289 S.W.3d at 249. However, the Western District then stated: "Therefore, the question remains whether [the experts'] statements regarding cost of service constitute competent and substantial evidence[,]" and ultimately concluded the experts' statements did not because the statements focused on only a subset of Atmos' distribution costs; i.e., the cost of equipment present at the customer's premises, and did not take into account other distribution costs. *Id.* at 249–51.

In this rate case, Feingold testified that "virtually all," and Ross testified that the "vast majority of," MGE's margin or non-gas costs for Residential Service and Small General Service rate class customers is fixed and does not depend on the volume of natural gas used by a particular customer within the class. The only significant countervailing evidence was Meisenheimer's testimony that a significant portion of MGE's cost of service for these customers varies with the amount of natural gas a customer within that class uses. In these circumstances, the testimony of Feingold and Ross constitutes competent (i.e., relevant and admissible—*Noranda*, 356 S.W.3d at 309) and substantial (i.e., probative of the issue the evidence was offered to prove and not necessarily quantity or even quality—*Id.*) evidence on the whole record that the cost of service for a customer within the Residential Service or Small General Service rate classes does not vary with the volume of natural gas a customer within the class uses with the result that a fixed + volumetric rate design would cause high-volume users within a class to subsidize low-volume users within that class. *See also Public Counsel,* 293 S.W.3d at 72–73 and n. 8.

OPC fails to persuade us that this finding is unreasonable. OPC also fails to explain why this finding, even if erroneous, resulted in prejudice to MGE's customers. The PSC chose to accept the factual conclusion of MGE and Staff that MGE's requested SFV rate design accurately allocates a customer's cost of service to the customer. In view of that finding, it does not matter what volume of natural gas "an average low-income . . . consumer" uses because under MGE's rate design, each customer pays for only that customer's true cost of service and the amount of natural gas the customer actually consumes. The findings related to intra-class subsidization under a fixed + volumetric rate design, and the amount of natural gas used by "an average low-income . . . consumer," are not unreasonable. This point is denied.

## II. OPC FAILS TO PERSUADE U.S. THAT THE SFV RATE DESIGN APPROVED BY THE PSC PREJUDICES MGE'S RESIDENTIAL SERVICE AND SMALL GENERAL SERVICE CUSTOMERS WHO USE LESS NATURAL GAS THAN AVERAGE.

In its second point relied on, OPC contends that the PSC erred because the substantive order is "unlawful" in that it subjects customers within each rate class who "use lower[-] than[-]average amounts of natural gas to undue and unreasonable prejudice and disadvantage[,]" in violation of sections 393.130, RSMo Cum.Supp.2002 and 393.140. As we explained above, in denying OPC's first subpoint of its first point relied on, the PSC resolved conflicting factual conclusions between experts by accepting the expert opinions of MGE and Staff that MGE's cost of service for any customer within MGE's Residential Service and Small General Service rate classes does not depend on the volume of natural gas used by that customer. Based on this finding, the PSC concluded that MGE's requested SFV rate design accurately allocates MGE's cost of service to each customer within the class. As a result, MGE's rate design does not prejudice or disadvantage any customer within the Residential Service or Small General Service rate classes because each customer is charged that customer's true cost of service regardless of whether the customer uses lower-than-average, higher-than-average, or average amounts of natural gas.

As OPC contends, it is true that Residential Service and Small General Service rate class customers who use lower-than-average amounts of natural gas likely will pay more to MGE in a normal, or warmer-than-normal, weather year under MGE's SFV rate design than they would have under OPC's requested fixed + volumetric rate design. However, under the PSC's resolution of the conflicting expert opinions, that fact is not because the SFV rate design prejudices lower-than-average users, but rather because OPC's requested fixed + volumetric rate design would favor them by requiring higher-than-average users to pay a portion of MGE's cost to serve the lower-than-average users.

MGE's SFV rate design is not "unlawful" under sections 393.130 and 393.140 because it requires payment only of the customer's true cost of service, and does not prejudice or disadvantage any customer.[11] OPC fails to persuade us the PSC's

11. OPC also asserts that MGE's SFV rate design prejudices customers who live in warmer-than-average, geographical areas of MGE's service territory because those areas have a higher concentration of lower-than-average-use customers. OPC did not raise the alleged geographical prejudice in its application to the Commission for a rehearing and, therefore, is precluded from raising the issue in this appeal. § 386.500.2 ("The appli-

substantive order is unlawful. OPC's second point is denied.

### III. SOUTHERN UNION FAILS TO PERSUADE U.S. THE PSC'S USE OF SOUTHERN UNION'S CAPITAL STRUCTURE (INCLUDING PAN HANDLE'S DEBT) TO DETERMINE MGE'S RATE OF RETURN WAS EITHER UNLAWFUL OR UNREASONABLE, OR THAT MGE'S AUTHORIZED RETURN ON COMMON EQUITY WAS UNREASONABLE.

#### A. Use of Southern Union's Capital Structure to Determine MGE's Rate of Return.

■ In its single point relied on, Southern Union claims the PSC erred in setting MGE's authorized rate of return by using Southern Union's capital structure (rather than a hypothetical capital structure that is similar to the capital structures of stand-alone, local natural gas distribution companies that operate businesses comparable to the business operated by MGE as a division of Southern Union), and this error makes the substantive order "unlawful" and "unreasonable." Southern Union fails to persuade us that the substantive order is either unlawful or unreasonable on that ground.

Southern Union appears to argue that the substantive order is "unlawful" because it misapplies the law in that the PSC's use of Southern Union's capital structure to determine MGE's rate of return precludes MGE from receiving a return commensurate with returns received on investments in other enterprises having corresponding risks as required by *Hope,* 320 U.S. at 603, 64 S.Ct. 281 and *Bluefield,* 262 U.S. at 692–93, 43 S.Ct. 675.

■ An order of the PSC that "misapplies" or "misinterprets" the law is unlawful. *See Public Counsel,* 293 S.W.3d at 71. However, Southern Union's argument completely overlooks the legal and practical effect of the fact that MGE is an operating division of Southern Union and has no capital structure or legal existence independent of Southern Union. Southern Union *is* MGE and, as the PSC concluded in this and MGE's last two rate cases, MGE must operate with the results of Southern Union's management decisions, including Southern Union's capital structure. In both legal and practical terms, "enterprises having corresponding risks" are enterprises similar to Southern Union within the meaning of *Hope* and *Bluefield.* Southern Union fails to persuade us the substantive order is unlawful on the ground Southern Union asserts.[12]

Southern Union also appears to argue that the substantive order is "unreasonable" for essentially the same reason it claims the substantive order is unlawful; i.e., the PSC's use of Southern Union's

---

cant shall not in any court urge or rely on any ground not so set forth in its application for rehearing."). Even if OPC had preserved the issue for our review, we would reject OPC's argument for the same reason we reject its preserved point. Under the PSC's resolution of the conflicting expert opinions, MGE's SFV rate design requires payment only of the customer's true cost of service and does not prejudice or disadvantage any customer.

**12.** The PSC recognized in the substantive order that the PSC has discretion to use a hypothetical capital structure in determining a utility's rate of return when the utility's capital structure has "too much equity" or is part of a holding company system. *See Public Counsel,* 293 S.W.3d at 84. Obviously, neither of these fact patterns are present in this case. We also note that Southern Union does not refer us to any judicial decision in which the use of a utility's actual capital structure was deemed unlawful or unreasonable, and we found none in our own research.

capital structure to determine MGE's rate of return precludes MGE from receiving a return commensurate with returns received on investments in other enterprises having corresponding risks as required by *Hope* and *Bluefield.*

█ Section 393.130.1, RSMo Cum. Supp.2002, requires "[a]ll charges made or demanded" by a natural gas utility "for gas ... or any service rendered or to be rendered shall be just and reasonable and not more than allowed by law or by order or decision of the commission." Under *Hope,* the fixing of just and reasonable rates involves "a balancing of the investor and the consumer interests[,]" and "the making of 'pragmatic adjustments.'" *Id.* at 602–03, 64 S.Ct. 281. In determining rates, a regulatory body is "not bound to the use of any single formula or combination of formulae." *Id.* at 602, 64 S.Ct. 281. The question is whether the regulatory body's "order 'viewed in its entirety' meets the requirements" of the law. *Id.* "[I]t is the result reached not the method employed which is controlling." *Id.*

> It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry ... is at an end. The fact that the method employed to reach that result may contain infirmities is not then important.

*Id.*; *see also Public Counsel,* 293 S.W.3d at 82. Furthermore, Missouri courts long have recognized that "ratemaking is not an exact science," no methodology is statutorily prescribed or limited, and "[t]he complexities inherent in a rate[-]of[-]return determination necessarily require that the PSC be granted considerable discretion." *State ex rel. Associated Natural Gas Co. v. Public Service Commission of Missouri,* 706 S.W.2d 870, 880 (Mo.App. W.D.1985) (internal citations omitted); *Arkansas* *Power & Light Co. v. Missouri Public Service Commission,* 736 S.W.2d 457, 462 (Mo.App. W.D.1987); *see also Noranda,* 356 S.W.3d at 307.

The PSC's use of Southern Union's capital structure to determine MGE's rate of return was just and reasonable because: (1) it was supported by competent and substantial evidence on the whole record, and was not arbitrary, capricious, or an abuse of discretion; and (2) the total effect of the use of Southern Union's capital structure cannot be said to be unjust and unreasonable. Although Hanley and Murray opined that the PSC should use a hypothetical capital structure to determine MGE's rate of return, Lawton recommended the PSC use Southern Union's capital structure. The PSC specifically found Lawton's testimony to be "persuasive" and the "most credible" on this issue, and chose to resolve this conflict in factual conclusions by accepting Lawton's recommendation. Lawton's opinion is competent and substantial evidence and is not clearly contrary to the overwhelming weight of the evidence, and the PSC's acceptance of Lawton's opinion was not arbitrary, capricious, or an abuse of discretion. As a result, we are bound by the PSC's finding that Southern Union's capital structure should be used to determine MGE's rate of return.

In addition, Southern Union fails to persuade us that the total effect of the PSC's use of Southern Union's capital structure was "unjust and unreasonable." The experts' recommended rates of return for MGE were: Murray 7.34%, Lawton 7.772%, and Hanley 8.137%. The choice of a rate of return roughly in the middle range of recommended returns is a reasonable exercise of the PSC's "considerable discretion" in determining an appropriate return on investment. The PSC's use of Southern Union's capital structure cannot

be said to be "unjust or unreasonable" with the result that judicial inquiry on this issue is at an end even if the method the PSC employed to reach MGE's rate of return contains infirmities.

## B. Treatment of Pan handle's Debt.

▮ Southern Union also argues that the substantive order is "unlawful" because the PSC should have, but did not, exclude the debt of Panhandle—a subsidiary of Southern Union—from Southern Union's capital structure in determining MGE's authorized rate of return. If the debt had been excluded, Southern Union's common equity would have increased from 38.66 to 47.82% of its capital, and the cost of Southern Union's long-term debt would have decreased from 6.258 to 6.173%.[13] Southern Union further contends that the PSC's inclusion of Panhandle's debt in the calculation of the cost of Southern Union's long-term debt represents a change in the PSC's treatment of Panhandle's debt in that, in MGE's two immediately preceding rate cases, the PSC excluded Panhandle's debt from the calculation of the cost of Southern Union's long-term debt.[14] Although recognizing that the PSC is not bound by stare decisis, Southern Union argues that the PSC "must provide an explanation of the evidence supporting the change in methodology[ ]" and the PSC did not do so.

In view of the fact that Southern Union's capital structure includes Panhandle's debt and we have concluded that the PSC's use of Southern Union's capital structure to determine MGE's rate of return was neither "unlawful" nor "unreasonable," we deny Southern Union's first claim under this subpoint.

With respect to Southern Union's second claim under this point, Southern Union refers us to State ex rel. Churchill Truck Lines, Inc. v. Public Service Commission of Missouri, 734 S.W.2d 586, 593 (Mo.App. W.D.1987) and Arkansas Power & Light, 736 S.W.2d at 462, as support for its argument that the PSC "must provide an explanation of the evidence supporting the change in methodology." These decisions do not support Southern Union's argument, but rather in the case of Churchill, the proposition that

an administrative agency is not bound by the doctrine of stare decisis. The mere fact that an administrative agency departs from a policy expressed in prior cases which it has decided is no ground alone for a reviewing court to reverse the decision. 734 S.W.2d at 593 (internal quotation and citation omitted); and, in the case of Arkansas Power & Light, the proposition that

[i]n the context of this appeal it suffices to say the [PSC] can use a new equation or change methods from case to case depending on the facts. There is no per

13. Southern Union asserts in its brief that exclusion of Panhandle's debt would have increased Southern Union's cost of long-term debt to 7.761%, but the exhibit Southern Union references to support this assertion shows Southern Union's cost of long-term debt would have decreased to 6.173%.

14. As Southern Union notes, we affirmed the PSC's exclusion of Panhandle's debt from the calculation of the cost of Southern Union's long-term debt in MGE's most recent past rate case. Public Counsel, 293 S.W.3d at 84–

85. In that rate case, Southern Union appealed the PSC's treatment of Panhandle's debt. We indicated that the PSC's action was "reasonable" because the cost of Panhandle's debt to Southern Union was zero since the debt was non recourse to Southern Union. Immediately thereafter, we noted that Southern Union failed to expound on its contention and, without its guidance as to how the PSC abused its discretion, we were "unable to say that the PSC's action was unreasonable or an abuse of discretion." Id. at 85.

*se* requirement the [PSC] must use the same formula on successive applications by the same company. There was evidence the 1CP method was appropriate here. The [PSC] is not bound to a single formula, and where there is competent and substantial evidence to support the methodology used, a reviewing court is in no position to reverse.

736 S.W.2d at 462.

As we explained above, there was competent and substantial evidence in this rate case to support the PSC's use of Southern Union's capital structure—which included Panhandle's debt—to determine MGE's rate of return. Lawton recommended the PSC use Southern Union's capital structure, and specifically opined that Southern Union's capital structure should include Panhandle's debt. Lawton's calculations of Southern Union's cost of capital clearly show he also included Panhandle's debt in his calculation of Southern Union's cost of long-term debt. Although Murray recommended that the PSC use a hypothetical capital structure, he specifically noted that the PSC should not follow its prior practice of excluding Panhandle's debt from the calculation of Southern Union's cost of debt, and instead should include Panhandle's debt for that purpose if the PSC used Southern Union's capital structure because the "financing activities" of Southern Union and Panhandle were "becoming more blurred with time." Furthermore, at an evidentiary hearing, a commissioner specifically questioned Murray about "new information" that indicated "Southern Union doesn't manage its finances separately from ... Panhandle[.]" In MGE's alternative position on capital structure before the PSC, even Hanley initially proposed that Panhandle's debt should be included in Southern Union's capital structure—including for the purpose of calculating the cost of Southern Union's long-term debt—before reversing course and recommend-

ing that Panhandle's debt be excluded from Southern Union's capital structure.

The PSC's change in methodology to include Panhandle's debt in the calculation of the cost of Southern Union's long-term debt was just and reasonable because it was supported by competent and substantial evidence on the whole record, and was not arbitrary, capricious, or an abuse of discretion. Southern Union fails to persuade us that the total effect of the use of Southern Union's capital structure—including Panhandle's debt—was unjust and unreasonable.

### C. Determination of MGE's Authorized Return on Common Equity.

In an alternative argument, Southern Union claims the PSC erred in failing to increase MGE's return on equity to reflect the additional financial risk posed by Southern Union's "equity-thin capital structure." We deny Southern Union's alternative claim because: (1) Southern Union failed to meet its burden to present evidence establishing an appropriate increase in MGE's return on equity necessary to reflect that additional risk; and (2) the PSC's authorized return on equity for MGE falls within the zone of reasonableness for returns on equity based on the national average authorized return on equity for gas utilities.

Southern Union had the burden of proof to show the proposed increase in its rates was just and reasonable. § 393.150.2. In its brief, Southern Union does not point us to any evidence that establishes an appropriate increase in MGE's return on equity necessary to reflect the additional financial risk posed by Southern Union's "equity-thin capital structure." As a result, Southern Union fails to meet its burden of proof and we deny its alternative claim.

Southern Union's alternative claim also fails because the PSC's authorized return

on equity for MGE falls within the zone of reasonableness for gas utilities' authorized returns on equity. The national average return on equity for gas utilities authorized in the first three quarters of 2009 was 10.11%. The PSC utilized a zone of reasonableness that extended from 1% below to 1% above the national average, with the PSC's authorized return on equity for MGE of 10% falling roughly in the middle of the zone. "The United States Supreme Court has instructed the judiciary not to interfere when the [PSC's] rate is within the zone of reasonableness," *State ex rel. Public Counsel v. Public Service Commission*, 274 S.W.3d 569, 574 (Mo.App. W.D. 2009), and we decline to interfere in this case.

In addition, as explained above, Southern Union has failed to persuade us that the total effect of the PSC's rate-of-return determination was unjust and unreasonable, or that MGE's authorized return on equity should have been increased to reflect the additional financial risk posed by Southern Union's "equity-thin capital structure." Southern Union's point is denied.

The PSC's substantive order and tariffs order are affirmed.[15]

BARNEY and BATES, J., Concur.

**15.** Southern Union filed a motion to strike a portion of OPC's reply brief on the ground that portion of the brief raised errors not included in OPC's points relied on in violation of Missouri Court Rule 84.04(e) (2011). In view of our affirmance of the PSC's orders, we deny Southern Union's motion as moot.