In the Matter of MISSOURI-AMERICAN WATER COMPANY'S REQUEST FOR AUTHORITY TO IMPLEMENT A GENERAL RATE INCREASE FOR WATER AND SEWER SERVICE PROVIDED IN MISSOURI SERVICE AREAS, Respondent,

**Missouri Public Service Commission, Respondent,**

v.

**OFFICE OF PUBLIC COUNSEL, Appellant.**

**WD 79988**

Missouri Court of Appeals, Western District.

OPINION FILED: May 30, 2017

As Corrected May 31, 2017

Motion for Rehearing and/or Transfer to Supreme Court Denied June 29, 2017

Jennifer L. Heintz and William R. England, III, Jefferson City, MO, for respondent.

Marc D. Poston, Jefferson City, MO, for appellant.

Before Division Three: Anthony Rex Gabbert, Presiding Judge, Victor C. Howard, Judge and Cynthia L. Martin, Judge

Cynthia L. Martin, Judge

The Office of Public Counsel ("OPC") appeals from the Public Service Commission's ("Commission") report and order that consolidated Missouri-American Water Company's ("MAWC") water systems into three districts for the purpose of setting rates. OPC argues on appeal that the Commission erred in two respects. First, OPC asserts that the Commission's report and order is unlawful in that its creation of three water districts violates the statutory prohibition against providing an undue or unreasonable preference, prejudice, or disadvantage to one locality of the state over another. Second, OPC claims that the Commission's report and order is unreasonable in that the Commission made six findings of fact that are not supported by the record. We affirm.

### Factual and Procedural History

MAWC is a public utility and water corporation, as those terms are defined in section 386.020(43) and (59),[1] subject to regulation by the Commission as provided in Chapters 386 and 393. MAWC provides water service to nineteen distinct water systems, serving 459,439 customers in the state.[2] MAWC's water systems are spread throughout the state so that none are physically interconnected.

The Legislature created the Commission to serve as the state administrative agency responsible for the regulation of public utilities, including water corporations, in Missouri. Section 386.040; section 386.250(3). The Commission employs technical experts ("PSC Staff") who are responsible for representing the Commission and the State of Missouri in all Commission investigations, contested cases, and other proceeding unless PSC Staff timely files a notice of its intention not to participate. OPC is separate from the Commission and PSC Staff. Section 386.710 gives OPC the authority to represent and protect the interests of the public in any proceeding before the Commission or any appeal from an order by the Commission.

On July 31, 2015, MAWC filed proposed tariff sheets seeking a revised rate to generate an additional $51 million in gross annual revenue. In addition to requesting a revised rate, MAWC asked the Commission to approve its proposal to combine its nineteen water systems into three water districts for the purpose of moving toward

---

**1.** All statutory references are to RSMo 2016 unless otherwise noted.

**2.** MAWC is also a sewer corporation, as that term is defined by section 386.020(49), subject to regulation by the Commission. The Commission's report and order consolidated MAWC's twelve existing sewer districts into two sewer districts. MAWC has not challenged this aspect of the Commission's report and order on appeal, so we do not discuss it further.

consolidated tariff pricing. MAWC's proposed tariff sheets had an effective date of August 30, 2015. The Commission suspended the proposed tariff sheets until June 28, 2016, so as to allow time to study the proposed tariff sheets and to determine if the rates resulting therefrom were just, reasonable, and in the public interest.

The Commission received requests to intervene from: the Missouri Industrial Energy Consumers ("MIEC"); the Missouri Department of Economic Development—Division of Energy ("MO Division of Energy"); Triumph Foods, LLC; the City of Warrensburg, Missouri; the City of St. Joseph, Missouri; the City of Joplin, Missouri; Public Water Supply District Nos. 1 and 2 of Andrew County, Missouri; the City of Riverside, Missouri; the City of Brunswick, Missouri; Stonebridge Village Property Owners Association; and the Utility Workers Union of America Local 335. The Commission granted all requests to intervene.

The Commission held public hearings across the state in January 2016. Following those public hearings, MAWC, PSC Staff, OPC, MIEC, and the MO Division of Energy submitted a non-unanimous stipulation and agreement to increase MAWC's revenue by $30.6 million to the Commission. No party objected to the non-unanimous stipulation and agreement. The Commission approved this non-unanimous stipulation and agreement as well as a second non-unanimous stipulation and agreement. An evidentiary hearing was held regarding the remaining issues on March 21-23, 2016.

While the Commission heard evidence as to the remaining issues, the only issue that is relevant to this appeal was determining how to allocate the cost of providing service to the various water systems for the purpose of developing the rates that the customers served by those systems must pay. In other words, the Commission considered MAWC's request to consolidate its nineteen water systems into three water districts for the purpose of moving toward consolidated tariff pricing. MAWC's costs of service include those costs that can be directly assigned to a particular water system—e.g., the cost of a treatment facility or the mains and pipes that service that system—as well as costs that are applicable to every water system—e.g., a customer call center, billing services, and other corporate services.

The Commission took testimony about methods for allocating costs to water systems. First is district-specific pricing, which takes all of the costs of providing service to each individual water system and develops rates based upon that water system's cost of service. Under district-specific pricing, the customers in each water system pay a rate based only on the costs associated with providing service to that water system. Second is single-tariff pricing, in which all costs from the utility are combined and rates are developed on a utility-wide basis so that all customers pay the same rate based on the combined service costs of all water systems. Under single-tariff pricing, every customer in every water system operated by a particular water utility pays the same rate. District-specific pricing and single-tariff pricing are the extremes on the spectrum of possible methods of allocating service costs and determining rates. A third method for allocating costs is consolidated tariff pricing, in which several water systems are consolidated into a larger district for the purpose of allocating costs and determining rates. Under consolidated tariff pricing, all customers within a consolidated district pay the same rate based on the combined service costs of the water systems within that consolidated district. Effectively, consolidated tariff pricing implements single-tar-

iff pricing amongst consolidated subsets of water systems operated by a particular water utility.

In a 2000 rate case, the Commission directed MAWC to move away from its then-existing single-tariff pricing method toward district-specific pricing. By the time MAWC filed the instant proposed tariff sheets, MAWC's service costs were allocated amongst the various water systems it operated using a hybrid of both methods. The seven largest water systems MAWC operated had rates that were designed based on their respective cost of service (district-specific pricing). The remaining water systems MAWC operated were consolidated into "District 8," which was then broken into additional sub-districts for the purpose of allocating costs and determining rates (single-tariff pricing).

In 2010, the General Assembly enacted section 393.320, which addresses the acquisition of smaller water utilities by larger water utilities, and which directed a method whereby upon acquisition, the smaller utility would be consolidated into the larger utility for ratemaking purposes. Though the impetus for enactment of section 393.320 is not certain, the parties agree that earlier Commission directives to water utilities to move toward district-specific pricing (as had been the case with MAWC's 2000 rate case) were in direct opposition to the concept of consolidation for ratemaking purposes. And the parties agree that the Commission has been faced over the past several years with a flurry of failed or failing small water districts hampered by district-specific pricing, and unable to generate necessary revenues for essential infrastructure or regulatory compliance.

For a variety of reasons, including that legislative encouragement of consolidation signaled by section 393.320, MAWC's July 2015 rate case proposed to consolidate its water systems into three districts based on the similarity of the level of rates paid by each water system. Under MAWC's proposal, the customers in each consolidated district would pay the same rate based on the collective costs of service for all of the water systems in the consolidated district.

PSC Staff also proposed consolidating MAWC's water systems into three districts so that the customers in each district pay the costs of service associated to their district. PSC Staff's proposed consolidation was based on operational characteristics and geographical location. PSC Staff's District 1 is comprised of the water systems in east-central Missouri; District 2 is comprised of water systems in northwest Missouri; and District 3 is comprised of water systems in southwest and west-central Missouri. Each of the three districts proposed by PSC Staff include one large water system as an anchor so that costs of service within the district could be spread among a larger customer base. The water systems in each of the three districts proposed by PSC Staff share labor and management function as well as have similar sources for water, whether surface water, alluvial wells, or deep wells. MAWC did not oppose PSC Staff's proposed consolidation of the water systems into thee districts.

In addition to MAWC's proposed three-district consolidation plan and PSC Staff's proposed three-district consolidation plan, the Commission had before it three other options for allocating costs to the water systems. OPC, MIEC, the City of Brunswick, the City of St. Joseph, and the City of Joplin filed a non-unanimous stipulation and agreement proposing to maintain MAWC's eight water districts with slight modifications. The City of Riverside proposed its own consolidation plan at the evidentiary hearing. Under the City of

Riverside's plan, the City of St. Joseph and the City of Joplin would each remain in their own districts, but all other water systems would be consolidated into a single district. The final option before the Commission was to consolidate all of the water systems MAWC operated into a single district and employ single-tariff pricing.

After hearing all of the evidence, the Commission issued its report and order ("Report and Order"), adopting PSC Staff's consolidation plan for MAWC's water systems. In reaching its decision, the Commission recognized that, while MAWC's water systems are spread across the state so that they are not physically interconnected, MAWC's "annual cost to serve a residential customer is fairly consistent across the existing districts." For most of MAWC's residential customers, the annual cost of service is $400 to $500. The most significant outliers are Platte County, where 5,335 customers each have an annual cost of service totaling $1,031.48, and Brunswick, where 330 customers each have an annual cost of service totaling $702.92. The similarity in the cost of providing service to MAWC customers exists from district to district because the cost of capital is the same for every water system. For instance, the cost of pipes, meters, and other supplies is the same for every water system operated by MAWC.

The Commission found that "[c]onsolidation of water rates will help address some structural problems within the water industry." The water industry, unlike the electric and gas industries, is fragmented in that most of the water systems are classified as "small or very small," which means that a water system serves between 25 and 3,300 customers. MAWC has the same fragmentation problem in that, of its nineteen water systems, twelve serve less than 3,300 customers. Fragmentation cre-

ates inefficiencies in that the cost of complying with state and federal regulations is inversely related to the number of customers in a water system. The fragmentation problem has resulted in small, privately owned water systems in receivership.

The regulatory manager of the PSC Staff's water and sewer unit, James A. Busch ("Busch") testified as to how consolidated tariff pricing can alleviate the fragmentation problem found in the water industry. Busch opined: "If consolidated pricing allows for MAWC or other entities to acquire troubled systems to keep them out of receivership, then consolidated pricing is a favorable change that could provide benefit to Missouri citizens without any undue burden or cost." Busch explained:

> [PSC] Staff spends a significant portion of its time speaking with owners and management of many water ... utilities. This time includes entities that are currently providing service in Missouri, entities that have exited the water ... business in Missouri, and entities that are interested in coming to Missouri. Through these interactions, Staff has been made aware that consolidated pricing is a major consideration in the decision to own and operate systems in Missouri and on whether or not to expand. It is [PSC] Staff's opinion, based on its years of experience, that a move toward further consolidation will send a positive signal to those companies.

Busch opined that "[c]onsolidating rates helps to spread [the costs associated to environmental upgrades mandated by regulation] to a much larger customer base, which means that all MAWC customers and more Missouri citizens will have access to safe and adequate water at just and reasonable rates." The Commission found Busch's testimony on the effect of consoli-

dated tariff pricing on struggling water systems credible.

Further, the Commission found that consolidated tariff pricing would reduce administrative and regulatory costs. The Commission found that the costs of billing and collections would be reduced with the implementation of consolidated tariff pricing. According to the Commission, another benefit of consolidated tariff pricing would be reduced regulatory costs due to calculating fewer rates within a single rate case. The Commission also found that consolidated tariff pricing has the benefit of spreading the costs of large capital investments among all customers in a consolidated district, which will limit the shock when new infrastructure must be installed and making the cost of service more affordable for all.

The Commission also recognized that consolidated tariff pricing carries with it the risk that MAWC will have an incentive to overbuild its water system to maximize shareholder profits. To address that concern, the Commission adopted the PSC Staff's five-year capital planning report proposal in which MAWC is required to report all capital improvement plans to the Commission by January 31 of each year. PSC Staff will have the ability to review MAWC's capital improvement plans and make recommendations. Further, all capital expenditures will be subject to full Commission review in MAWC's future rate cases.

In adopting PSC Staff's three-district consolidation plan, the Commission's Report and Order rejected the argument that section 393.130 requires the use of district-specific pricing and forbids the use of single-tariff pricing or consolidated tariff pricing. Further, the Commission's Report and Order concluded that section 393.320, which establishes the procedure whereby a water utility serving more than 8,000 cus-

tomers attempting to acquire a water utility serving 8,000 or less customers may establish a rate for the small system to be acquired, guided the Commission's decision to adopt PSC Staff's three-district consolidation plan. Section 393.320 "shows that the legislature is aware of the affordability problems faced by small water systems and allows those problems to be ameliorated by consolidation with a larger service area for ratemaking purposes." Thus, the legislature is not hostile to consolidated tariff pricing.

After the Commission issued its Report and Order, OPC filed an application for rehearing, which the Commission denied. OPC appeals.

### Standard of Review

Section 386.510 provides that we review the Commission's Report and Order to determine whether it is lawful and reasonable. *Laclede Gas Co. v. Office of Pub. Counsel*, No. WD79830, 523 S.W.3d 27, 31–32, 2017 WL 1149140, at *3 (Mo. App. W.D. Mar. 28, 2017). The Commission's Report and Order has a presumption of validity so that the appellant bears the burden to prove by clear and satisfactory evidence that the order is unlawful or unreasonable. Section 386.430.

The lawfulness of the Commission's Report and Order refers to " 'whether statutory authority for its issuance exists.' " *Laclede Gas Co.*, 523 S.W.3d at 32, 2017 WL 1149140, at *3 (quoting *In re Verified Application & Petition of Liberty Energy (Midstates) Corp.*, 464 S.W.3d 520, 524 (Mo. banc 2015)). All legal issues are reviewed *de novo. Id.* If we find that the Commission's Report and Order is unlawful, we need not reach the issue of reasonableness. *Id.* If, however, we find that the Commission's Report and Order is lawful, then we must consider whether it is reasonable. *Id.* " 'The [Commission's] order is

determined to be reasonable when the order is supported by substantial, competent evidence on the whole record; the decision is not arbitrary or capricious[;] or where the [Commission] has not abused its discretion.' " *Id.* (quoting *Liberty Energy (Midstates) Corp.*, 464 S.W.3d at 524).

## Analysis

OPC challenges both the lawfulness and the reasonableness of the Commission's Report and Order. In its first point on appeal, OPC argues that the Commission's Report and Order is unlawful in that it violates section 393.130's prohibition against providing an undue or unreasonable preference, advantage, prejudice, or disadvantage to one locality over another. In its second point on appeal, OPC asserts that the Commission's Report and Order is unreasonable in that six discrete findings are arbitrary and capricious, are against the weight of the evidence, are not supported by competent and substantial evidence, and constitute an abuse of the Commission's discretion. We discuss OPC's points on appeal separately.

### *Point One: Lawfulness*

■ OPC's first point on appeal argues that the Commission's Report and Order is unlawful in that its adoption of the three-district consolidation plan proposed by the PSC Staff violates section 393.130. That statute provides, in relevant part:

1. [E]very water corporation ... shall furnish and provide such service instrumentalities and facilities as shall be safe and adequate and in all respects just and reasonable. All charges made or demanded by any such ... water corporation ... for ... water ... service rendered or to be rendered shall be just and reasonable and not more than allowed by law or by order or decision of the commission. Every unjust or unreasonable charge made or demanded for

... water ... service, or in connection therewith, or in excess of that allowed by law or by order or decision of the commission is prohibited.

. . . .

3. No ... water corporation ... shall make or grant any undue or unreasonable preference or advantage to any person, corporation or locality, or to any particular description of service in any respect whatsoever, or subject any particular person, corporation or locality or any particular description of service to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

. . . .

The plain language of the statute does not mandate that customers pay only the exact cost of service and no more. Instead, it provides that no "undue or unreasonable preference or advantage" may be given to any customer or locality.

OPC's argument is that the Commission's Report and Order violates section 393.130 in that "it authorizes an 'undue or unreasonable preference or advantage' to customers in certain localities, and authorizes an 'undue or unreasonable prejudice or disadvantage' for customers in other localities." [Appellant's Brief, p. 35] OPC claims that section 393.130 prohibits charging customers of one water system rates higher than the reasonable costs to render service to that particular water system. In other words, OPC argues that consolidated tariff pricing is unlawful because it results in the subsidization of one water system's customers by customers of another water system.

OPC is not arguing, however, that *any* consolidation of water systems is improper under section 393.130 so that the Commission has absolutely no authority to consolidate. To do so would be contrary to the

argument it made to the Commission[3] : "Consolidating districts will create advantages and disadvantages—disadvantages, depending on the locale of the water system. That alone, however, doesn't mean consolidating isn't lawful ... since the statute qualifies those prohibitions to those that are undue or unreasonable, *suggesting that consolidation is legal, so long as the record supports the Commission conclusion that such consolidation is not undue or unreasonable.*"

Instead, OPC's argument is that consolidation must not run afoul of section 393.130.3's prohibition against "granting undue and unreasonable prejudices, disadvantages, preferences and advantages to one locality over another." [Reply Brief, p. 12] Thus, the precise question before us is whether consolidating the costs of service of several water systems into a single district for the purpose of allocating costs of service to customers constitutes granting an undue or unreasonable preference or advantage to one locality over another or subjects a locality to a undue or unreasonable prejudice or disadvantage to one locality over another, thereby violating section 393.130.3.

OPC cites *State ex rel. Laundry, Inc. v. Public Service Commission*, 327 Mo. 93, 34 S.W.2d 37 (Mo. 1931), to support its position that the Commission's adoption of the PSC Staff's three-district consolidation plan discriminates in favor of some localities and against other localities in violation of section 393.130.3. In *Laundry, Inc.*, the question before our Supreme Court was whether a water company's refusal to classify two customers who met the requirements for the scheduled manufacturers' rate constituted wrongful, unlawful, unjust, and unreasonable discrimination against those two customers. *Id.* at 41. The Court recognized that section 10477, RSMo 1919—the precursor to section 393.130—required "the same charge for doing a like and contemporaneous service (*e.g.*, supplying water) under the same or substantially similar circumstances or conditions." *Id.* at 44. However, *Laundry, Inc.* recognized that the Legislature gave the Commission authority "to regulate and fix rates or charges for public utilities, and to classify those users or consumers to whom such rates or charges shall be applicable." *Id.* at 43. In fixing rates, the Commission must be mindful that "the principle of equality designed to be enforced by legislation and judicial decision forbids any difference in charge which is not based upon difference of service, and even when based upon difference of service must have some reasonable relation to the amount of difference, and cannot be so great as to produce unjust discrimination." *Id.* at 44-45. Thus, the Court held that the water company's refusal to classify two customers who met the requirements for the scheduled manufacturers' rate constituted wrongful, unlawful, unjust, and unreasonable discrimination against those two customers. *Id.* at 45-46.

*Laundry, Inc.* simply spoke in terms of forbidding a difference of charge that is

---

**3.** To do so would also be contrary to OPC's agreement to the non-unanimous stipulation and agreement proposing to maintain MAWC's eight water districts with slight modifications. Of those eight districts, seven of the districts were single water systems that had rates designed specifically to their respective costs of service. The remaining water systems owned and operated by MAWC were consolidated into "District 8," which was then broken into additional sub-districts for the purpose of allocating costs of service. Thus, District 8, which OPC proposed through its the non-unanimous stipulation and agreement, itself would have been a consolidated district. The Commission concluded that OPC could not simultaneously propose that the consolidation and reallocation of the costs of service proposed in its non-unanimous stipulation and agreement is appropriate and argue that district-specific pricing is required by section 393.130.

not based on the difference of service. Here, there is no difference in charge based on a difference of service, and OPC does not assert that there has been an improper classification of customers or rate discrimination within a class of customers. To the contrary, every residential customer in a particular consolidated district pays the same rate for water service. That rate is determined based on the costs of service for all residential customers in all water systems located within the consolidated district. Thus, the Commission's adoption of PSC Staff's three-district consolidation plan does not discriminate on the basis of service, and the Commission's Report and Order does not violate those principles set forth in *Laundry, Inc.*

OPC next relies on *State ex rel. City of Cape Girardeau v. Public Service Commission*, 567 S.W.2d 450 (Mo. App. 1978), and *State ex rel. City of West Plains v. Public Service Commission*, 310 S.W.2d 925 (Mo. banc 1958), for the proposition that section 393.130 requires equitable cost causation. In other words, OPC claims that these two cases require that residential rates reflect the true cost to the individual customers. OPC's reliance on these cases is misplaced.

In *City of Cape Girardeau*, at issue was the Commission's allocation of the costs of service to an electric company's customers. 567 S.W.2d at 452. The Commission elected to allocate the costs of service equally among rural customers and city customers. *Id.* The City of Cape Girardeau argued that because the cost of providing electricity per customer was less for those customers residing in the city versus those customers residing in rural areas, section 393.130 required the lower costs of service for city customers to be reflected in the rate adopted by the Commission. *Id.* The court disagreed:

[W]hat the city has seemingly chosen to ignore throughout these proceedings is that [section] 393.130(3) forbids discrimination against persons as well as locations. The commission's order and report make it clear that it was aware of this dual obligation and in this case chose to emphasize equity to the individual user by maintaining a rate system designed on the basis of cost to a class of customer rather than to area. For this reason, we view the issue as a question of reasonableness.... We cannot hold as a matter of law that the city was entitled to the relief it sought merely by showing a lower cost of service to the city area as a whole.

*Id.* at 453. The court clearly held that, contrary to OPC's argument on appeal, section 393.130.3 does not require, *as a matter of law*, that the rate each customer pays reflect the costs of providing service to that particular locality. The Commission's allocation of costs of service is a question of reasonableness, not lawfulness.

Similarly, *City of West Plains* did not hold that rates must be based on the costs of service to a particular locality. There, the Commission's report and order eliminated license and occupation taxes as an operational expense payable by all of the telephone company's customers and instead allocated those taxes to the customers in the respective cities levying such taxes. 310 S.W.2d at 927. The court noted that the Commission was vested with "the statutory power and authority ... to determine and pass upon the question of what rates are necessary to permit a utility to earn a fair and reasonable return [which] necessarily includes the power and authority to determine what items are properly includable in a utility's operating expenses and to determine and decide what treatment should be accorded such expense items." *Id.* at 928 (citations omitted). The court held:

We are of the view, therefore, that the commission, as a part of its power and duty to establish reasonable rates which would produce a fair return, **could** lawfully provide for and prescribe the regulations and practices to be indulged by the utility to produce the desired result, including the power to permit Western to file a general rule with its rate schedule authorizing that utility to pass on license and occupation taxes to certain subscribers.

*Id.* at 929 (emphasis added). *City of West Plains* did not hold that the Commission was **required** to allocate the licensing and occupation taxes to those customers residing in the localities imposing those taxes so as to not discriminate on the basis of locality against those customers residing in areas without such taxes. Instead, it merely held that doing so was lawful. *Id.*

The *City of West Plains* court then explained its views as to systemwide rate-making:

We are able to discern no legitimate reason or basis for the view that a utility must operate exclusively either under a systemwide rate structure or a local unit rate structure, or the view that an expense item under a systemwide rate structure must of necessity be spread over the entire system regardless of the nature of the item involved. Experts in utility rates may well conclude that a "hybrid system" or a "modified system" of rate making, wherein certain expense items are passed on to certain consumers and certain items are thereby treated on a local unit basis and others on a systemwide basis, is the system which will produce the most equitable rates. And it would appear to be the province and the duty of the commission, in determining the questions of reasonable rates, to allocate and treat costs (including taxes) in the way in which, in the

commission's judgment, the most just and sound result is reached.

*Id.* at 933. It is clear from this language that the court concluded that the Commission had the statutory authority to spread the costs of service to all of the telephone company's customers. *Id.* It is instructive to note that, similar to MAWC, the telephone company in *City of West Plains* had multiple exchanges spread throughout the state so that "many of the various exchanges were relatively far removed from the localities of other exchanges in Western's system." *Id.* at 927-28.

OPC next claims that *State ex rel. Office of Public Counsel v. Public Service Commission*, 367 S.W.3d 91 (Mo. App. S.D. 2012), established that "prejudice and disadvantage occurs [sic] when customers are required by pay above their 'true cost of service.' " [Appellant's Brief, p. 35] At issue in *Office of Public Counsel* was whether the Commission's report and order was unlawful in that, by instituting a uniform customer charge to recover all fixed distribution costs, customers who use lower-than-average amounts of natural gas are subject to undue and unreasonable prejudice and disadvantage in violation of section 393.130. 367 S.W.3d at 93. In deciding to institute a uniform customer charge, the Commission resolved competing expert testimony in favor of the position that the gas company's "cost of service for any customer within [the company's] Residential Service and Small General Service rate classes does not depend on the volume of natural gas used by that customer." *Id.* at 106. **Based on that factual finding**, the Commission concluded that the uniform customer charge "does not prejudice or disadvantage any customer within the Residential Service or Small General Service rate classes because each customer is charged that customer's true cost of service regardless of whether the customer

uses lower-than-average, higher-than-average, or average amounts of natural gas" in violation of section 393.130. *Id.* The court carefully tied its conclusion as to the lawfulness of the uniform customer charge to the factual finding that the Commission made. Contrary to OPC's assertion, the court did not hold that section 393.130 requires the rate to reflect a customer's true cost of service.

Finally, OPC asserts that *State ex rel. City of Joplin v. Public Service Commission*, 186 S.W.3d 290 (Mo. App. W.D. 2005), held that "[o]rdering subsidization of one water system by another water system that objects to paying a subsidy is unlawfully discriminatory." [Appellant's Brief, p. 35] *City of Joplin* concerned MAWC's 2000 rate case. 186 S.W.3d at 292. In that 2000 rate case, a surplus of approximately $880,000 per year from the Joplin district was purportedly applied to benefit ratepayers in other districts who, without the benefit of the Joplin surplus, would have been faced with significant rate increases. *Id.* The reviewing court reversed the Commission's report and order as to the Joplin surplus and remanded for further findings of fact and conclusions of law concerning the Joplin district's rate design. *Id.* at 293. While the Commission had jurisdiction over the remanded 2000 rate case, MAWC filed a second rate case. *Id.* at 294. The Commission took no further action on the 2000 rate case until after it had approved a stipulation and agreement relating to the second rate case. *Id.* The Commission then ordered that the issues present in the 2000 rate case were moot because the second rate case superseded the 2000 rates. *Id.* On appeal, we concluded that; based on an exception to the mootness doctrine, the Joplin district's rate design in the 2000 rate case was not moot and remanded to the Commission to make findings of fact and conclusion of law "that will allow the courts to determine whether the rates were unduly prejudicial under section 393.130.3." *Id.* at 296, 300. The court did not, as OPC argues, hold that section 393.130 prevented the Commission from implementing a consolidated tariff pricing structure where all customers in a water district, regardless of water system, pay for the costs of service for the entire water district.

OPC, as the appellant, bears the burden of overcoming the report and order's presumption of lawfulness. Section 386.430. *City of West Plains* states that, when ratemaking, the Commission has the statutory authority to decide whether to employ a single-tariff pricing system, a district-specific pricing system, or a hybrid of the two in order to achieve the most just and sound result. 310 S.W.2d at 933. The plain language of section 393.130.3 does not forbid the Commission from adopting a consolidated tariff pricing structure wherein several water systems are combined to create a single water district wherein all customers, regardless of their water system, pay for the costs of service for the entire water district. And none of the cases cited by OPC support its position that this type of consolidated tariff pricing structure runs afoul section 393.130.3's prohibition against granting an undue or unreasonable preference or advantage to a locality. OPC, as the appellant, has not met its burden to demonstrate that the Commission's Report and Order violates section 393.130.3's prohibition against a grant of any undue or unreasonable preference or advantage to one locality over another.

Point One is denied.

### Point Two: Reasonableness

OPC's second point on appeal argues that the Commission's Report and Order is unreasonable. A challenge to reasonableness is an argument that the Commission's

Report and Order is not supported by substantial, competent evidence on the whole record; is arbitrary or capricious; or constitutes an abuse of discretion. *Laclede Gas Co.*, 523 S.W.3d at 31–32, 2017 WL 1149140, at *3. OPC identifies six discrete findings of fact that it argues are unreasonable. We presume that these findings of fact are correct and will affirm unless OPC, as the appellant, shows by clear and satisfactory evidence otherwise. Section 386.430.

■ " 'We consider the evidence, along with all reasonable supporting inferences, in the light most favorable to the Commission's order.' " *Laclede Gas Co.*, 523 S.W.3d at 35, 2017 WL 1149140, at *6 (quoting *State ex rel. Pub. Counsel v. Mo. Pub. Serv. Comm'n*, 289 S.W.3d 240, 246-47 (Mo. App. W.D. 2009)). " 'If substantial evidence supports either of two conflicting factual conclusions, we are bound by the findings of the [Commission].' " *Id.* (quoting *State ex rel. Pub. Counsel,* 289 S.W.3d at 247). Further, witness credibility determinations are left to the Commission, which can believe none, some, or all of the testimony offered by a witness. *State ex rel. Public Counsel,* 289 S.W.3d at 247.

*Challenged Finding One: Similar Sources for Water*

■ OPC first challenges the Report and Order's finding that "[t]he systems within the proposed Districts ... share similar sources for their water." OPC points to evidence that District One combines the St. Louis Metro water system, which utilizes surface water via the Missouri and Meramec Rivers, with the Mexico water system, which utilizes groundwater. Further, District Three combines the Joplin water system, which utilizes surface water via Shoal Creek as well as groundwater, with several smaller water systems,

all of which are served only by groundwater. OPC claims that the method and cost of extracting surface water are different than the method and cost of extracting groundwater. Thus, according to OPC, the Report and Order is unreasonable in that this finding is contrary to the evidence.

OPC's finding fails to take into account the testimony of Busch, the regulatory manager of the PSC Staff's water and sewer unit. Busch testified that, in creating the three districts ultimately adopted by the Commission in its Report and Order, PSC Staff intended:

> to choose the combination of service territories for each of the three hybrid districts for water with respect to the basic concept of cost causation that underlies [district-specific pricing]. [PSC] Staff reviewed the operating characteristics of the systems and generally placed each system with other systems that exhibited similar operating characteristics.... determined by source of supply (surface water, alluvial wells, or deep wells) and based on geographic location. It is [PSC] Staff's opinion that these hybrid districts would exhibit the general principles of cost causation as explained in more detail below.

Busch then explained that the largest of the two water systems in District One, St. Louis metro and Jefferson City, receive their water supply from surface water. With respect to District Two, Busch testified that the three water systems within the district receive their source of supply from alluvial wells. Busch also explained that, in District Three, the water systems primarily receive their water supply from deep wells but recognized that the Joplin water system utilized surface water in combination with deep wells. While Busch acknowledged that there is some difference in the water sources utilized by the systems within each water district, Busch's

testimony clearly established that systems within the proposed districts share similar water sources, as found by the Commission. The Commission never found, as OPC's argument suggests, that all water systems within each district share similar water sources.

### Challenged Finding Two: Consistency of Annual Cost to Serve a Residential Customer

█ The second factual finding challenged by OPC as unreasonable is the Commission's observation that annual cost to serve a residential customer is fairly consistent across the eight districts existing at the time the instant rate case was filed despite inherent differences in the water systems making up those districts. OPC sets forth several reasons to support its argument that this finding of fact is unreasonable.

First, OPC argues that this finding of fact is unsupported by the record, especially in light of the rest of the paragraph in the Report and Order. We first note that the Commission expressly limited its finding of consistency to recognize that there are outliers. The entire paragraph reads:

Despite the inherent differences in the various water systems, [MAWC's] annual cost to serve a residential customer is fairly consistent across the existing districts. For most districts, the annual cost to serve a customer is in the $400 to $500 range. The annual cost to serve a residential customer in the St. Louis Metro district, which serves 366,815 customers, is $481.86 per year. The most significant outliers are Brunswick, which serves 330 residential customers at an annual customer cost of $702.92, and Platte County, which serves 6,216 customers at an annual customer cost of $1,031.48.

Thus, when reading the paragraph in its entirety, it is clear that the Commission's finding of fact is not as broad as the first sentence reads in isolation.

Nonetheless, OPC asserts that the finding of fact is unreasonable. OPC does not argue that the figures cited by the Commission in the Report and Order are inaccurate. Instead, OPC claims that the numbers cited by the Commission demonstrate that MAWC's annual cost of providing service to a residential customer is markedly different depending on the water system. OPC explains:

The contradiction is exemplified when the Order states the annual cost to serve a single residential customer in the St. Louis Metro district is $481.86 per year, the cost to serve a residential customer in Brunswick is $702.92 per year, and the cost to serve a residential customer in Platte County is $1,031.48 per year. These differences are most troubling in District 2, where the $1,031.48 cost to serve Platte County is more than *twice* the $418.39 cost to serve the unconnected St. Joseph water system. Accordingly, customers in St. Joseph will foot the majority of any main or treatment facility installed in Platte County despite the fact the Platte County system will not provide those customers with a single drop of water. St. Joseph is also being consolidated with the Brunswick water system, which is also a high-cost system at $702.92 annually. Customers in St. Joseph, due in part to the larger population in St. Joseph, will pay the majority of any improvements in Brunswick despite receiving no service from that system.

[Appellant's Brief, pp. 40-41] (Footnotes omitted.) This argument by OPC fails to acknowledge the testimony before the Commission that explained that the costs of capital are same across the water sys-

tems serviced by MAWC and the testimony explaining why the annual cost per customer differs among water systems.

OPC's argument also fails to acknowledge that Busch testified that many of the costs to serve a water system are the same and only vary between systems because of how they are allocated. Busch stated:

[OPC] and MIEC make the argument that the seven large [systems], which have remained independent with regard to rates, have their own specific costs. However, most of the costs of providing service to all of MAWC customers are very similar, if not the same, from [system] to [system].

For example, MAWC will have a cost of capital approved in this case. This cost of capital is the same for all of MAWC's districts. MAWC buys various supplies for the repair and replacement of mains, meters, etc. MAWC pays the same for those products regardless if MAWC uses them in St. Louis or in Lake Taneycomo. The management of MAWC receives a salary. That salary remains the same for all of MAWC's customers. MAWC provides a customer service function to all customers and those costs are the same regardless of the location of the customer. The only difference is how these costs are allocated, and the allocation process is much more art than science.

OPC further ignores testimony by Karl McDermott ("McDermott"), an expert witness presented by MAWC, which established that a difference between water systems in the annual cost per customer is not necessarily a difference in the actual cost to provide water service. Instead, according to McDermott's testimony, the difference in annual cost per customer can be attributed to the cost of regulatory compliance. McDermott testified that compliance with the Safe Water Act annually costs on average $4 per customer for those systems serving more than 500,000 people. If a water system serves no more than 100 customers, though, the annual cost of compliance with the Safe Water Act balloons to $300 per customer. In other words, the cost of regulatory compliance is fairly static among water systems, regardless of the size of the system. But when there are few customers to share the cost of compliance, the cost per customer skyrockets. Thus, the difference in the annual cost per customer is not necessarily a difference in the actual cost to provide the water service in a particular district. Instead, it can be attributable to a lack of size, which the Commission recognized in its Report and Order. Indeed, evidence before the Commission demonstrated the annual cost per customer is lowest in those MAWC water systems with the most customers.

Busch's testimony that the cost of capital is the same throughout those water systems operated by MAWC and McDermott's testimony explaining that the cost of regulatory compliance is fairly static among water systems, when considered together, support the Commission's finding of fact that the cost to provide service to a residential customer is fairly consistent among the eight water districts in existence at the time the instant rate case was filed.

Next, OPC claims that "[r]equiring customers to pay well over the costs incurred by the utility to provide service to that customer is unreasonable and a violation of Section 393.130," citing *State ex rel. Office of Public Counsel v. Public Service Commission*, 367 S.W.3d 91 (Mo. App. S.D. 2012), as support for the proposition that section 393.130 requires rates to reflect only a customer's true cost of service. [Appellant's Brief, p. 41] OPC claims that the cost discrepancies between the water systems demonstrates that the large majority

of customers in the three districts will pay above their true cost of service. As we have already explained, *supra*, *Office of Public Counsel* does not hold as OPC suggests. True cost of service is not required in the making of rates.

OPC goes on to claim that, under the three-district consolidation plan adopted by the Commission, customers in the St. Louis Metro service area will pay over 95 percent of any upgrade to the water systems in Jefferson City or Mexico, the other two water systems in District One, because St. Louis Metro represents 95 percent of the total customer base within the district. Thus, according to OPC, the larger water systems will always pay the "lion's share" of any investment in any water system within its district. [Appellant's Brief, p. 42] OPC makes this argument but fails to explain how it relates to its position that the Commission made an unreasonable finding of fact that the annual cost to serve a residential customer is fairly consistent across the eight districts existing at the time the instant rate case was filed despite inherent differences in the water systems making up those districts.

▪ Finally, OPC points to the Commission's report and order from MAWC's 2000 rate case, which made the opposite factual finding. In its report and order for the 2000 rate case, the Commission found that MAWC's "various districts differ significantly in such cost drivers as water supply source, water treatment process, proximity of the supply source, aggregate demand, and customer density." OPC argues that "[n]othing has changed to move the differences between the separate water systems differing 'significantly' to the Commission's most recent finding that the costs are similar." [Appellant's Brief, p. 43] This argument by OPC ignores that "the [Commission] is not bound by *stare desci-*

*sis* based on prior administrative decisions, so long as its current decision is not otherwise unreasonable or unlawful." *State ex rel. Aquila, Inc. v. Pub. Serv. Comm'n*, 326 S.W.3d 20, 32 (Mo. App. W.D. 2010). We have concluded that the Commission's factual finding in the instant Report and Order is reasonable. Thus, the Commission was not bound by its determination in the 2000 rate case.

### Challenged Finding Three: Fragmentation Problems Creating Affordability Problems

▪ The third factual finding challenged by OPC as unreasonable is the Commission's finding that MAWC has a "fragmentation problem" in its service territory that creates "affordability problems." OPC argues: "The fact that there are separate water systems does not in any way 'create' affordability concerns—the affordability issues are created by the fact that a particular water system has high costs and by the fact that many residential customers are low-income, including many low-income elderly customers." [Appellant's Brief, p. 43]

In making this argument, OPC ignores the testimony the Commission had before it. McDermott explained how consolidated tariff pricing benefits the current state of the water industry:

The water industry differs significantly from the gas and electric industries in the sense that the water industry has traditionally been far more fragmented. According to the Environmental Protection Agency (EPA), as of 2010, there were over 52,000 Community Water Systems (CWS)—water systems that supply water to the same population year round. This number is much larger than the natural gas and electric industries, which both have around 3,000 providers respectively. According to the

EPA, about 77 percent of CWS are classified as "small or very small," which means they serve between 25-3,300 customers respectively. These small systems serve about 30 percent of customers, while the remaining CWS serve 70 percent of customers. This illustrates the fragmentation of the water industry. Unlike the gas and electric industry, the water industry is populated with many small companies that do serve small populations. The larger companies that are present in the industry serve the bulk of the population.

The water industry experiences many inefficiencies because of the fragmentation of the market and the role of these similar systems. First, the smaller systems have struggled to keep up with the regulatory burdens imposed by various regulatory agencies. These small systems find it increasingly difficult as the Federal government has imposed more and more stringent environmental regulations (the Clean Water Act, the Safe Drinking Water Act, EPA Regulations, etc.). These regulations come with increased costs of compliance that small companies find hard to afford. For example, the EPA estimates that compliance with the Safe Water Drinking Act costs an average of $4 per household per year for systems serving more than 500,000 people, but $300 per household per year for systems serving no more than 100 customers. Further, the water industry is extremely capital and cost intensive (more than the gas and electrical industry), since most costs are long-term fixed property, plant and equipment. The water industry also faces the problem of aging infrastructure. These costs cannot be reduced in the short-run, which further burdens these small companies. Finally, these smaller companies struggle to keep up with the administrative burdens such as timely rate filings, which means they are not able to accurately recover their cost of service within their rate. *The inability of small water companies to keep up with administrative and regulatory burdens as well as deal with capital costs, coupled with the prevalence of these companies creates inefficiencies within the water industry.*

The inefficiencies associated with the fragmentation of the water industry provide the opportunity for consolidation. *When water companies expand their customer base they are able to reduce inefficiencies associated with smaller water companies. As a result, larger water companies have begun to acquire these smaller, inefficient systems and smaller systems have begun to merge in order to take advantage of economies of scale. These larger water systems are better able conform [sic] to regulatory burdens and deal with the capital costs associated with upgrading infrastructure by spreading the capital costs over a larger customer base. The concentration and consolidation of companies in the water industry results in increased efficiency. This increase in efficiency allows for lower costs to serve customers as well as improved service.*

(Emphasis added.) (Footnotes omitted.) Further, John Cassidy ("Cassidy"), an auditor employed by PSC Staff, provided testimony as to the number of customers each of MAWC's water systems serve respectively. Of MAWC's nineteen water systems, twelve serve less than 3,300 customers. According to McDermott's testimony as to the classification of water systems, those twelve water systems are classified as "small or very small." Thus, the Commission could have made the reasonable inference that these twelve water systems operated by MAWC are part of

the "fragmentation problem" that has created "affordability problems" that can be resolved by consolidated tariff pricing.

### *Challenged Finding Four: New Federal and State Regulations Impose a Heavy Burden on Small Water Systems*

 The fourth factual finding challenged by OPC as unreasonable is the following observation made by the Commission: "The Federal and state governments have recently imposed many new regulations designed to protect public and environmental health. Those regulations are needed, but they impose a heavy burden on small systems with few customers." OPC asserts that there was no evidence before the Commission that: (1) there were any regulations imposed by the state of Missouri; (2) that there are recent regulations imposing new burdens; and (3) that recent regulations create affordability concerns.

OPC again ignores the evidence before the Commission. As discussed *supra*, McDermott testified: "These small systems find it increasingly difficult as the Federal government has imposed more and more stringent environmental regulations (the Clean Water Act, the Safe Drinking Water Act, EPA Regulations, etc.)." McDermott also testified that compliance with those regulations create affordability problems. Further, Frank Kartmann ("Kartmann"), President of MAWC, testified about the company's water treatment plants:

[MAWC] operates 11 water treatment plants. *These plants are where water is tested for quality and contaminants and treated to meet or surpass the quality standards set by the EPA and subsequently enforced by the Missouri Department of Natural Resources.* Impurities, and excess minerals are removed or treated through a combination of chemicals, a progression of filtration materials, with filtered water being dis-

infected as a final protection for consumers. *Treatment facilities must keep pace with increasingly stringent EPA regulations,* and the introduction of new contaminants into the water supply, *in order to meet the specific consumption and quality needs of the communities they serve.*

(Emphasis added.) When considered together, the testimony of McDermott and Kartmann support the Commission's finding that regulations recently imposed by the federal and state governments result in a heavy burden on small water systems.

### *Challenged Finding Five: A Five-Year Capital Expenditure Plan Will Offset the Incentive to Overbuild to Maximize Shareholder Profits*

 The fifth finding of fact challenged by OPC is the Commission's finding that requiring MAWC to file a five-year capital expenditure plan will offset MAWC's incentive to overbuild its water system in order to maximize shareholder profits. Under the plan adopted by the Commission, PSC Staff and all parties to the instant rate case would have the ability to review MAWC's capital expenditure plans and then could make recommendations. All capital expenditures made by MAWC would be subject to full review in future rate cases. OPC claims that "[i]t will be virtually impossible for other parties to prove a particular investment is only being made to maximize shareholder profits" so that the consolidated tariff pricing model adopted by the Commission will result in "overbuilding, excessive expenditures and higher rates for all customers." [Appellant's Brief, p. 45]

Busch explained the benefit of the five-year capital expenditure plan: "[I]t gives the parties an opportunity to understand what the—what [MAWC] is proposing to do and to maybe make suggestions in a

manner to find maybe a better or at least a lower cost alternative than what [MAWC is] thinking about." OPC's argument to the contrary is merely speculative. There is no evidence in the record to support OPC's argument that MAWC will engage in unnecessary investment or that the five-year capital expenditure plan adopted by the Commission's Report and Order will be ineffective. Further, OPC's argument is disingenuous because the non-unanimous stipulation and agreement which it signed proposed that the Commission's Report and Order require MAWC to submit a five-year capital expenditure plan with the Commission annually.

### Challenged Finding Six: Improper Reliance on Busch's Testimony on the Benefit of Consolidated Tariff Pricing

■ Finally, OPC claims that the Commission's Report and Order is unreasonable in that it relied on the following opinion from Busch: "If consolidated pricing allows for MAWC or other entities to acquire troubled systems to keep them out of receivership, then consolidated pricing is a favorable change that could provide benefit to Missouri citizens without any undue burden or cost." OPC argues that Busch's testimony is contrary to section 393.320.6, which already requires newly acquired small water systems to be consolidated into an existing water district for the purpose of determining rates. OPC asserts that, if the Commission's intention in adopting consolidated tariff pricing in this case was to reassure unknown water systems considering buying multiple water systems in Missouri that the Commission is open to consolidation, then the Commission's Report and Order "is an unlawful attempt to issue a rulemaking through a rate case." [Appellant's Brief, p. 46]

First, we note that the Commission found Busch's testimony regarding struggling water systems "very credible." The

testimony on which OPC asserts the Commission unreasonably relied concerned that very topic. We defer to the Commission's witness credibility determinations. *State ex rel. Public Counsel,* 289 S.W.3d at 247. Insofar as OPC claims that it was unreasonable for the Commission to rely on Busch's testimony as credible, we reject its claim.

Second, OPC is correct that section 393.320.6 requires a "small water utility" acquired by a "large water public utility" to be consolidated with an existing service area for the purpose of ratemaking. However, section 393.320 is limited in its scope. It took effect in 2010 so that it is inapplicable to the small water utilities that MAWC acquired prior to that date. Further, the statute defines "large water public utility" as a public utility that provides water service to more than 8,000 customers. Section 393.320.1(1). According to the Commission, MAWC is the only public utility in Missouri that meets that definition so that if "[s]ome other entity ... wanted to buy multiple water or sewer systems in Missouri and consolidate them for ratemaking purposes would not be able to take advantage of this statute and might still need the reassurance that consolidated-tariff pricing may be available." McDermott and Busch both testified that adopting the three-district consolidation plan in the instant case would reassure other water systems that the Commission was open to consolidation.

We disagree with OPC's claim that, if the Commission's intention is to signal that it is open to consolidated tariff pricing in future cases, it is engaging in an unlawful attempt to issue a rule through a rate case. While the effect of the Commission's Report and Order may be to signal its stance as to consolidated tariff pricing, the Commission's Report and Order is limited to setting rates for MAWC's service areas

alone based on the facts and circumstances before the Commission.

OPC failed to meet its burden under section 386.430 to demonstrate by clear and satisfactory evidence that the report and order is unreasonable. Point Two is denied.

## Conclusion

We affirm the Commission's Report and Order.

All concur